**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **DOROTHY J. MACK,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:07-CV-021-BH** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION** | § | |
| | § | |
| **Defendant.** | § | **Consent Case** |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the District Court's *Order of Reassignment*, dated April 26, 2007, this case been transferred to the undersigned United States Magistrate Judge for the conduct of all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c). Before this Court are *Brief for Plaintiff* ("Pl. Mot."), filed June 25, 2007, and *Defendant's Response to Plaintiff's Brief* ("Def. Mot."), filed September 26, 2007. Plaintiff did not file a reply. Having reviewed the evidence of the parties in connection with the pleadings, the undersigned is of the opinion that the final decision of the Commissioner should be **REVERSED** and **REMANDED**.

**I. BACKGROUND**[1]

**A.     Procedural History**

Dorothy J. Mack ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits. Plaintiff filed an application for disability insurance benefits ("DIB") under Title II and supplemental security income

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

- 1 -

("SSI") under Title XVI of the Social Security Act on September 19, 2002. (Tr. at 57-59, 199-206). Plaintiff claimed she was disabled due to: (1) visual defects, (2) musculoskeletal problems, (3) right shoulder limitation, (4) hypertension, and (5) mental restrictions. Plaintiff's application was denied initially and upon reconsideration. (Tr. at 29-35, 38-41). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 42). A hearing, at which Plaintiff personally appeared and testified, was held on July 15, 2004. (Tr. at 415-423). On September 1, 2004, the ALJ found that Plaintiff's severe mental impairments met the requirements for Listing 12.05C and issued a fully favorable decision. (Tr. at 230, ¶4; Tr. at 223-230). On its own motion for review, the Appeals Council determined that Plaintiff's medical record did not show the degree of adaptive limitation necessary to meet Listing 12.05C and vacated the ALJ's decision on March 21, 2005. (Tr. at 231-233). Pursuant to the Appeals Council's remand, the ALJ held another hearing on September 12, 2005. (Tr. at 380-414). On November 25, 2005, the ALJ issued his decision finding Plaintiff not disabled. (Tr. at 15-26). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 9-11). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 9). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on January, 29, 2007.

**B.    Factual History**

    **1.    Age, Education, and Work Experience**

Plaintiff was born on December 6, 1962. (Tr. at 57, 384). She graduated from high school and attended special education classes all twelve years. (Tr. at 384). She previously worked as a nurse's aid, dining room attendant, housekeeper, and daycare worker. (Tr. at 83; 98-105; 410-11).

## 2.    Medical Evidence

Although Plaintiff has a complex medical history, the case at bar centers on her alleged mental limitations. Accordingly, the Court recites only the medical evidence pertinent to this issue.

Dr. Richard Eckert, Ph.D., a psychologist, conducted a consultative psychological examination of Plaintiff on October 28, 2002, as part of Plaintiff's application for disability benefits. (Tr. at 132-36). Dr. Eckert noted that Plaintiff appeared depressed and that she had poor memory, concentration, abstract ability, and expressive and receptive language abilities. (Tr. at 133). Dr. Eckert administered a number of psychological tests and noted that Plaintiff "appeared to give up rather easily on a number of items given to her." (Tr. at 134). He "felt that her motivation was not conducive to her very best performance" and cautioned that his assessment "might reflect a low estimate of her abilities." *Id*. With these caveats in mind, he estimated that Plaintiff was mildly mentally retarded and that she had an IQ of 66. *Id*. She could read at the third grade level and spell at the second grade level, both of which scored in the "retarded" range. (Tr. at 134-35). Her arithmetic ability was at the fifth grade level and scored in the "average" range. *Id*. Plaintiff's poor performance on another examination suggested impairment in her ability to plan, problem-solve, and devise strategies for dealing with problems that confront her. (Tr. at 135). Plaintiff also exhibited mild deficits in attention, repetition, memory functioning, calculation, and judgment. *Id*. Dr. Eckert's diagnostic impression of Plaintiff was vascular dementia with depressed mood; expressive and receptive language disorder; mild mental retardation; self-reported stroke; moderate to severe psychosocial stressors emphasizing occupational, social function, and financial pressures; and a Global Assessment and Functioning ("GAF") score of 65. (Tr. at 136).

On March 26, 2003, Dr. Danny Bartel, M.D., conducted a neuroconsultation as part of an examination into Plaintiff's complaint of a droopy eye. (Tr. at 169-71). Dr. Bartel noted that

Plaintiff was alert and cooperative with fluent speech, and that there was no aphasia, agnosia, or apraxia.[2] (Tr. at 170). He also noted that Plaintiff's affect was appropriate with normal mood and no mood liability, and that her thought processes were goal directed, that her intelligence was normal, and that her concentration span and memory skills were intact. *Id.*

On January 24, 2003, Dr. M. Chappuis, Ph.D., a state agency medical consultant ("SAMC") reviewed Plaintiff's medical records. (Tr. at 141-153). The SAMC noted that Plaintiff had an organic mental disorder (Listing 12.02) and determined that a mental residual functional capacity ("RFC") assessment was necessary. (Tr. at 141-42). The SAMC also noted that although some of the medical evidence supported a finding of a mental disorder, some of the reports and Plaintiff's daily activities contradicted such a finding. (Tr. at 153). A mental RFC assessment found "moderate" limitations in Plaintiff's ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. at 154-55).

Subsequent to the Appeals Council's remand, Plaintiff submitted medical records for the period covering March 27, 2003, through March 31, 2005. (Tr. at 260-362). None of these records contained any additional psychological examinations. *See id.* The only records that assess Plaintiff's mental abilities are those by Dr. Bartel on March 26, 2003. (*See e.g.*, Tr. at 294, 297, 300, 303).

---

[2] Aphasia is a "defect or loss of the power of expression by speech, writing or signs, or of comprehending spoken or written language, due to injury or disease of the brain." Agnosia is the "loss of the power to recognize the import of sensory stimuli." Apraxia is the "loss of the ability to carry out familiar, purposeful movements in the absence of paralysis or other motor sensory impairment." Dorland's Illustrated Medical Dictionary 38, 105, 110 (29th ed. 2000).

### 3. Hearing Testimony

A hearing was held before the ALJ on September 12, 2005. (Tr. at 380-414). Plaintiff appeared personally and was represented by attorney. *Id.* A medical expert and a vocational expert also testified at the hearing.

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was 42 years old on the date of the hearing. (Tr. at 384). She graduated from high school but was in special education classes for the entire time she was in school. *Id.* She received on-the-job certification as a nurse's aide and also previously worked as a mess attendant and a housekeeper. (Tr. at 385).

Plaintiff testified that she suffered from back and shoulder problems and that she had a stroke in 2002. (Tr. at 386-87). She has used a cane to walk ever since her stroke and reported difficulty lifting anything heavier than five or ten pounds. (Tr. at 387). She also had glaucoma in her right eye and carpal tunnel in both her hands. (Tr. at 388-90).

Plaintiff lived with her two daughters, ages 18 and 15, and a grandson. She had a driver's license and occasionally drove herself to the doctor's office, but never outside of town. (Tr. at 388). She assisted her daughters with the grocery shopping, housework, cooking, and laundry, but she needed help with her hygiene and grooming. (Tr. at 389, 393). Plaintiff testified that she needed to sit down whenever she assisted her daughters with the chores. *Id.* Plaintiff also testified that she had difficulty standing for more than five or ten minutes, walking more than a block, and sitting for long periods of time. (Tr. at 390-92). During the day, she occasionally watched television and assisted her daughter with their garden by holding plants while the daughter watered them. (Tr. at 394). Plaintiff's only source of income was her daughter's SSI check, and she and her eldest daughter managed the money. (Tr. at 395).

### b.    *Medical Expert Testimony*

Dr. Arthur Joyce, a licensed psychologist, testified as a medical expert ("ME") at the hearing. Dr. Joyce testified that Plaintiff had a valid diagnosis of vascular dementia that indicated an organic mental disorder. (Tr. at 399). As a result of this organic disorder, Plaintiff demonstrated a loss of cognitive abilities, occasional disorientation of time and place, and some short-term memory impairment. (Tr. at 400-01). Plaintiff had a moderate impairment on her activities of daily living; mild impairment in maintaining social functioning; moderate to marked impairment in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 403-05).

Dr. Eckert's finding of mild mental retardation muddled the ME's assessment of Plaintiff's organic mental disorder. The ME acknowledged that Dr. Eckert's notation of poor motivation on the evaluation, but when the ALJ sought confirmation that mild mental retardation was not one of Plaintiff's impairments, the ME responded, "[w]ell let me be clear. I can't substantiate it [mental retardation] based on that one evaluation that had the standard scores." (Tr. at 399-400). The ME later stated, "I can't rule out mental retardation based on the testing. I can only say that, given the documented poor motivation, she could have scored higher. Not necessarily that she would have, but that she could have." (Tr. at 402). The ME opined, however, that given his understanding of Plaintiff's background and past work history, she could have performed better than she did on the 2002 evaluation. (Tr. at 406).

Under questioning from Plaintiff's attorney, the ME acknowledged that Plaintiff's stroke was an intervening event that could have invalidated her prior history of doing simple tasks. (Tr. at 406-07). Plaintiff's attorney then asked whether "another test would be in order or a psychological evaluation," to which the ME responded, "[y]es, I would. I mean, to me, this 2002 evaluation was very difficult to – I mean, you're almost guessing whether it is valid or not. So again, it doesn't

mean it's not valid. It means, in my opinion, that they would need to reevaluate." (Tr. at 408).

### c.    Vocational Expert Testimony

Kathy Bottroff testified as a vocational expert ("VE") at the hearing. The VE characterized Plaintiff's past work as nurse's aide as she performed it in a nursing home as heavy, semi-skilled, with a specific vocational preparation ("SVP") of 4. (Tr. at 410). She also classified Plaintiff's past work as a dining room attendant and daycare worker as medium, unskilled work. (Tr. at 411). Given Plaintiff's mental RFC and a physical limitation to sedentary work, the VE testified that a hypothetical person would not be able to perform any of Plaintiff's past relevant work and possessed no transferrable skills. *Id*. A hypothetical person with this RFC, however, could perform sedentary, unskilled work as a weigher and checker, a hand cutter and trimmer, or as a telephone solicitor. (Tr. at 412).

Under examination by Plaintiff's attorney, the VE testified that a hypothetical person who could use their dominant hand only occasionally would only be able to work as a surveillance systems monitor. *Id*. The VE also testified that someone with a diminishing capacity to do work throughout the day would not be able to maintain employment. (Tr. at 413).

## C.    **ALJ's Findings**

The ALJ issued his decision denying benefits on November 25, 2005. (Tr. at 15-26). The ALJ found that Plaintiff had not engaged in substantial gainful activity since the her alleged onset date of July 16, 2002. (Tr. at 18; 25,¶2). The ALJ noted that Plaintiff alleged visual defects, musculoskeletal problems, right shoulder limitation, hypertension, and mental restrictions. (Tr. at 20). He also noted that Plaintiff had been diagnosed with vascular dementia, depressed mood, receptive language disorder, and sub-average intellectual functioning. *Id*. Although he found that Plaintiff suffered from a severe impairment or combination of impairments, (Tr. at 25, ¶3), he did

not identify which of the alleged or diagnosed impairments were severe within the meaning of the Social Security regulations.

The ALJ observed that "[t]he medical expert who testified at the remand hearing was of the opinion that mental retardation had not been established"; he further wrote that he "agreed with the medical expert's conclusion that the claimant does not meet the capsule definition of mental retardation, as deficits in adaptive functioning before age 22 have not been established." (Tr. at 21). Based on Plaintiff's daily activities and work history, the ALJ concluded that Plaintiff "has below average intellectual functioning but that she is not mentally retarded." (Tr. at 22). The ALJ further concluded that Plaintiff did not have an impairment or any combination of impairments that met or equaled the criteria for a listed impairment. (Tr. at 22; 25, ¶4).

The ALJ found Plaintiff's subjective statements concerning her limitations were not entirely credible in light of the medical record. (Tr. at 23; 25, ¶5). The ALJ further found that although Plaintiff could not perform any of her past relevant work, she retained the RFC for a "very wide range of sedentary work" at all times relevant to his decision. (Tr. at 23-4; 25, ¶¶6, 7). Based on Plaintiff's RFC, age, educational background, and work experience, the ALJ determined that the VE's testimony and the Medical-Vocational guidelines directed a finding of "not disabled." (Tr. at 24; 25, ¶11). The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time through the date of his decision. (Tr. at 24; 25, ¶12).

## II.   ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, but less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.** **Issues for Review**

The two issues presented for review are (1) whether the ALJ erred in finding Plaintiff did not establish a listed impairment, and (2) whether the ALJ fully and fairly developed the record with regards to Plaintiff's mental retardation.[3]

**C.** **Issue One: Listed Impairment**

The listed impairments in the Social Security regulations "are descriptions of various physical and mental illnesses...most of which are categorized by the body system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990). "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Id.* at 530. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* (emphasis in original). The criteria in the Listings are designed to be "demanding and stringent." *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994). This is because the Listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Zebley*, 493 U.S. at 532. The claimant bears the burden of proving that his impairments meet or equal impairments found within the Listings. *Henson v. Barnhart*, 373 F.Supp.2d. 674, 685 (E.D. Tex. 2005) (citing *McCuller v. Barnhart*, 72 Fed.Appx. 155, 158 (5th Cir. 2003); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990); 20 C.F.R. § 404.1526(a)). If a claimant fails to meet this burden, the court will find that substantial evidence supports the ALJ's finding. *Henson*, 373 F.Supp.2d at 685 (citing *Selders*,

---

[3] Plaintiff presents the issue for review as "[w]hether defendant's finding that plaintiff has the residual functional capacity for a wide range of sedentary work, is supported by substantial evidence and/or was reached through errors of the law." (Pl. Mot. at 1). The "Argument" section of Plaintiff's brief does not address the issue of RFC at all, but instead discusses the issues as the Court presents them. (*See* Pl. Mot. at 3-5).

914 F.2d at 620). However, the ALJ is required to discuss the evidence offered in support of a claim for disability and explain the basis for an unfavorable finding at step three. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).

In the Social Security regulations, "[m]ental retardation refers to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Listing 12.05. The required level of severity for mental retardation is met when any one of the four following requirements are satisfied:

> A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less; or
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
>
> D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.

*Id*.

In this case, the issue is whether Plaintiff established mental retardation under Listing 12.05C. Plaintiff's claim relied primarily upon Dr. Eckert's 2002 consultative psychological examination. (Tr. at 132-36). After conducting a series of tests, Dr. Eckert noted that Plaintiff "appeared to give up rather easily on a number of items" and felt that "her motivation was not conducive to her very best performance." (Tr. at 134). Nevertheless, Dr. Eckert found that Plaintiff

had an IQ of 66, was mildly mentally retarded, and showed moderate to severe psychosocial stressors. (Tr. at 134-36). Plaintiff's testimony about her daily activities also presented some evidence in support of her claim of mental retardation, as did her approximately twelve years of special education. (*See* Tr. at 384, 388-95).

The ALJ considered Plaintiff's evidence but found that she did not meet the requirements of Listing 12.05C. As required by 42 U.S.C. § 405(b)(1), he discussed the evidence offered by Plaintiff and explained the basis for the unfavorable finding. The ALJ's explanation for rejecting Plaintiff's evidence, however, is flawed for two reasons. First and foremost, the ALJ wrote that "[t]he medical expert who testified at the remand hearing was of the opinion mental retardation had not been established." (Tr. at 21). The ME did *not* testify that Plaintiff failed to establish mental retardation. Instead, in response to an explicit question whether Plaintiff was mentally retarded, he testified, "I can't substantiate it [mental retardation] based on that one evaluation that had the standard scores." (Tr. at 399-400) (referring to Dr. Eckert's evaluation). The ME later testified that he could not rule out mental retardation based upon Dr. Eckert's testing. (Tr. at 402). Thus, the ME gave an equivocal evaluation of Plaintiff's mental retardation based upon the only psychological evaluation in the medical record; he could neither substantiate nor rule out mental retardation as one of Plaintiff's impairments. In fact, to resolve the question of Plaintiff's mental retardation, the ME recommended a second evaluation because it was too difficult to determine which portions of Dr. Eckert's evaluation were valid. (Tr. at 408).

Second, the ALJ stated that he "agree[d] with the medical expert's conclusion that the claimant does not meet the capsule definition of mental retardation, as deficits in adaptive functioning before age 22 have not been established." (Tr. at 21). The ME's testimony regarding adaptive functioning is not as conclusive as the ALJ contends. In response to a question by the ALJ,

- 13 -

the ME testified that a person who maintained employment for fifteen years demonstrated adaptive functioning indicative of a lack of mental retardation. (Tr. at 402-03). Yet the ALJ himself stated that "much of that employment appears to have been less than substantial gainful activity at times." (Tr. at 403). Thus, it is not apparent that someone who engages in sporadic substantial gainful activity over a period of fifteen years would demonstrate the same level of adaptive functioning as someone who maintained consistent gainful employment over the same period. Additionally, the ME never discussed adaptive functioning before age 22 in the context of Listing 12.05. (*See* Tr. at 398-400). Most of the ME's testimony related to questions about Listing 12.02, an organic mental disorder. (*See* Tr. at 400-06). While there may be some overlap between the requirements of the two listings, the ALJ did not offer any explanation for why he used responses to questions about Listing 12.02 to support a determination regarding Listing 12.05.

Based on the discrepancies between the hearing transcript and the ALJ's written opinion, it is clear that the ALJ misconstrued the ME's testimony about whether Plaintiff met the requirements of Listing 12.05C. Since the reasoning is flawed, the Court finds that the ALJ's unfavorable step three determination lacks substantial supporting evidence.[4]

Absent a showing of prejudice, the Court will not reverse the decision of an ALJ for lack of substantial evidence. *Brock v. Chater*, 84 F.3d 726, 729 (5th Cir. 1996). For the reasons discussed in the following section, the Court finds that Plaintiff demonstrated prejudice.

**D.    Issue Two: Duty to Develop the Record**

The second issue for review is whether the ALJ failed to fully and fairly develop the record

---

[4]  The ALJ supplied two additional reasons to support his step three determination, namely Plaintiff's daily activities and the neurological examination by Dr. Bartel. (Tr. at 21-22). The Court will not substitute its judgment for that of the ALJ or reweigh the evidence on these two issues. *Greenspan*, 38 F.3d at 236. In light of the flawed interpretation of the ME's testimony, however, these additional reasons are insufficient to overcome the lack of substantial evidence for the step three finding.

by not ordering a second consultative psychological evaluation. (*See* Pl. Mot. at 4-5).

The ALJ has a duty to fully and fairly develop the facts relevant to a claim for benefits. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). A consultative examination may be necessary to develop a full and fair record. *Wren*, 925 F.2d at 128. A consultative evaluation becomes "necessary" only when the claimant presents evidence sufficient to raise a suspicion concerning a non-exertional impairment. *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987). While the decision to order a consultative examination is within the ALJ's discretion, *id*., an "ALJ must order a consultative evaluation when such an evaluation is necessary to enable the ALJ to make the disability determination." *Brock*, 84 F.3d at 728 (citing *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir.1977)).

In this case, Dr. Eckert's 2002 consultative psychological evaluation raised a reasonable suspicion of mental retardation. Indeed, the first ALJ found this evaluation to be very influential and determined that Plaintiff met the requirements of Listing 12.05C. (Tr. at 228-30). Based on the reasonable suspicion of mental retardation created by Dr. Eckert's evaluation, a second consultative evaluation that would have either reinforced or contradicted Dr. Eckert's findings was necessary to fully and fairly develop the record. *Jones*, 829 F.2d at 526. Additional support for the necessity of a second consultative evaluation lies in the ME's testimony about the validity of Dr. Eckert's evaluation. The ME testified that he was unable to either substantiate or rule out mental retardation based upon Dr. Eckert's evaluation. (Tr. at 399-400, 402). When explicitly asked whether he thought another psychological evaluation would be appropriate, the ME responded, "[y]es, I would. I mean, to me, this 2002 evaluation was very difficult to – I mean, you're almost guessing whether it is valid or not. So again, it doesn't mean it's not valid. It means, in my opinion, that they would need to reevaluate." (Tr. at 408). Given the ME's inability to refute the validity of Dr. Eckert's

evaluation and recommendation for a reevaluation, a second consultative evaluation was necessary to enable the ALJ to make the disability determination. *Brock*, 84 F.3d at 728. The ALJ's failure to order a second consultative psychological evaluation breached his duty to fully and fairly develop the facts relevant to Plaintiff's claim for benefits. *Carey*, 230 F.3d at 142; *Wren*, 925 F.2d at 128. Since a second evaluation would clarify the doubts surrounding Dr. Eckert's evaluation and might show mental retardation, Plaintiff has demonstrated prejudice. *Brock*, 84 F.3d at 728-29.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is **GRANTED** and Commissioner's motion for summary judgment is **DENIED**. The decision of the Commissioner is hereby **REVERSED** and the case is **REMANDED** for reconsideration consistent with this opinion.

**SO ORDERED**, on this 4th day of August, 2008.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

- 16 -